OPINION
{¶ 1} Defendant-appellant, Dale D. Spencer, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of murder, with a firearm specification. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On November 30, 2001, defendant was indicted on one count of murder, in violation of R.C. 2903.02,[1] with a firearm specification. The matter was heard before a jury in May 2003. On May 20, 2003, the jury found defendant guilty of murder, with a firearm specification. The trial court entered judgment convicting defendant of murder, with the specification, and sentenced defendant to 15 years to life in prison on the murder charge and an additional three years in prison for the firearm specification. Defendant appeals from this judgment and assigns the following errors:
ASSIGNMENT OF ERROR ONE
The defendant's conviction was against the manifest weight of the evidence.
ASSIGNMENT OF ERROR TWO
The defendant was denied the effective assistance of counsel guaranteed by the sixth amendment to the united states constitution.
 {¶ 3} By his first assignment of error, defendant asserts that his conviction was against the manifest weight of the evidence. As stated above, defendant was convicted of murder, with a firearm specification. In State v. Thompkins (1997),78 Ohio St.3d 380, 387, the Supreme Court of Ohio stated as follows:
* * * Weight of the evidence concerns "the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credibleevidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief."
(Emphasis sic.) Id., quoting Black's Law Dictionary (6 Ed. 1990) 1594.
 {¶ 4} When an appellate court determines whether a conviction is against the manifest weight of the evidence, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, at 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Thus, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387, quoting Martin,
at 175. Furthermore, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Thompkins, at 387, citing Tibbsv. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211.
 {¶ 5} In State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, appeal denied, 90 Ohio St.3d 1405, this court observed:
* * * "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, see [State v.]DeHass [(1967), 10 Ohio St.2d 230], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, unreported. It was within the province of the jury to make the credibility decisions in this case. See State v. Lakes (1964), 120 Ohio App. 213, 217,201 N.E.2d 809 ("[i]t is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness"). See State v.Harris (1991), 73 Ohio App.3d 57, 63, 596 N.E.2d 563 (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render the verdict against the manifest weight).
 {¶ 6} On the evening of November 16, 2001, Christian Bradley was killed by a single gunshot wound to his chest.[2] The police arrived at the scene of the crime approximately 30 seconds after two gunshots were fired. (Testimony of Columbus Police Officer John Davis, Tr. 35-36.) After the police arrived at the scene, they immediately separated witnesses. (Tr. 36.) According to Officer Davis, when the police separated witnesses, "a lot of people said they didn't see anything. And then * * * we ended up getting a little bit of information." Id. Officer Davis testified that Dale Spencer was developed as a suspect at the scene of the crime. According to Officer Davis, Brandon Mitchell told Officer Davis that he did not know who was the person that had been shot. (Tr. 45.)
 {¶ 7} Officer Smith Weir testified that he arrived at the scene of the crime immediately after Officers Ward and Davis. According to Officer Weir, after he attempted to separate witnesses, he initially was unable to "get much response in terms of description, or any witnesses, credible witnesses at the time." (Tr. 53.) According to Officer Weir, in his preliminary discussions with Devin Jackson, Devin Jackson said that he did not know who shot the victim. (Tr. 58.) At some point, Devin Jackson provided Officer Weir with a vague description of an unknown male that fled the scene.
 {¶ 8} Thaira Medley, who was 17 years old at the time of trial, was called as a witness on behalf of the state. Ms. Medley was Mr. Bradley's girlfriend. She described the events that led to the lethal shooting of her boyfriend as follows. On the evening of November 16, 2001, Ms. Medley played a joke on Mr. Bradley and hid in the backseat of his car. Mr. Bradley entered the car and drove around the neighborhood, apparently searching for Ms. Medley. When Mr. Bradley stopped the car at a red light, Ms. Medley let Mr. Bradley know she was in the car, and Mr. Bradley laughed. Mr. Bradley continued to drive the car until he parked in front of Devin Jackson's grandmother's house. Mr. Bradley exited the car. Ms. Medley remained in the backseat of the car. According to Ms. Medley, defendant approached Mr. Bradley, and the two conversed. Ms. Medley testified that defendant pulled out a gun and shot Mr. Bradley, and Mr. Bradley fell to the ground. Defendant fired another shot, and Ms. Medley ducked to the floor. Once she determined that the gunshots had ceased, Ms. Medley exited the car, ran to Latasha Harrington's house, and called 911. A tape recording of the 911 call was played for the jury at trial and was admitted into evidence. (Tr. 93.)
 {¶ 9} Ms. Medley testified that she had previously seen defendant at Ms. Harrington's house. Also, Ms. Medley recalled working with defendant at Taco Bell. Ms. Medley identified defendant at the scene of the crime when she was shown a single photograph, which was shown to her by the police. At trial, Ms. Medley identified defendant in the courtroom. (Tr. 100-101.) After Ms. Medley identified defendant in the courtroom, the prosecutor asked Ms. Medley, "is there any doubt in your mind that Dale Spencer is the man that shot Chris that night?" Ms. Medley replied, "No." (Tr. 101.)
 {¶ 10} Brandon Mitchell, a cousin of Devin Jackson, testified on behalf of the state. A warrant relating to Mr. Mitchell's failure to pay a ticket for driving without a valid operator's license was set aside prior to Mr. Mitchell testifying. (Tr. 120-121.) Also, at the time of the shooting, Mr. Mitchell had a pending felony carrying a concealed weapon charge. (Tr. 119.) Later, Mr. Mitchell pled guilty to a misdemeanor carrying a concealed weapon charge. Mr. Mitchell testified that he was talking with Rashanna Tucker outside his grandmother's house on the evening of November 16, 2001. At some point, Mr. Bradley, whom Mr. Mitchell did not know, pulled up in a car, got out of the car, and started to talk with Devin Jackson. Mr. Mitchell was standing across the street from Devin Jackson and Mr. Bradley. Mr. Mitchell testified that defendant talked with him and Ms. Tucker, walked across the street, and then argued with Mr. Bradley. According to Mr. Mitchell, Mr. Bradley initiated a physical confrontation with defendant by swinging his fist at defendant. Thereafter, both were swinging at each other. (Tr. 116.) The fight ended when, according to Mr. Mitchell, "Dale backed up and shot twice. The dude dropped." (Tr. 117.) As to what happened after the shooting, Mr. Mitchell stated, "I looked at Dale Spencer and he looked at me. I asked him, I said what are you still standing there for, and he left." (Tr. 118.) Mr. Mitchell identified defendant in the courtroom. (Tr. 117.)
 {¶ 11} Mr. Mitchell testified that, when the police arrived, he attempted to walk away from the scene, but the police stopped him. (See Tr. 118-119, 125.) Mr. Mitchell also acknowledged that initially he lied to the police by telling the police that he knew nothing about the shooting. (Tr. 122.) According to Mr. Mitchell, after the police started to blame him for the shooting, and after his grandmother and aunt encouraged him to tell the truth, he decided to tell the truth. (Tr. 122-123.)
 {¶ 12} Ms. Tucker testified that, after she heard gunshots, she saw "Dale" run. (Tr. 142.) At trial, Ms. Tucker did not know "Dale's" last name. It is not clear from the record whether Ms. Tucker identified defendant as the person that she saw running from the scene of the crime. (See Tr. 142 ["Q. What did you see? A. I saw Dale run. Q. Dale, this person? A. (nodding)."])
 {¶ 13} Devin Jackson testified on behalf of the state. Regarding the night of the shooting, he testified that, as he was crossing the street, he heard a gunshot, and then turned around and saw the second shot. (Tr. 153.) Devin Jackson saw defendant holding a gun. (Tr. 153.) Devin Jackson also testified that he "saw the fire from the gun." (Tr. 173.)
 {¶ 14} After the police arrived, Devin Jackson was placed into a detective's car. Devin Jackson acknowledged that, in a taped interview with Detective Daniel McGahhey on the night of the shooting, Devin Jackson stated that he did not see a gun. (Tr. 169, 175.) Devin Jackson testified that he was shown a single photograph by a detective and was asked to identify the person. (Tr. 170.)
 {¶ 15} Defendant testified at trial. According to defendant, on the evening of November 16, 2001, Mr. Bradley punched defendant in the mouth, which caused defendant to fall to the ground. At trial, defendant stated that he was "dazed from the punch" and when he looked up, there were "more people standing around than there was when I was, just before I punched in the mouth." (Tr. 256-257.) According to defendant, he thought that someone was "going to jump" him. (Tr. 257.) Consequently, he "got up and started running." Id. Defendant testified that, as he was running away, he heard two gunshots, and he feared that they were directed at him. Id. Defendant made sure he was okay and then went to his home. The next day, November 17, 2001, defendant learned that there was a warrant for his arrest. Defendant turned himself in at the Columbus Police Headquarters on November 22, 2001.
 {¶ 16} Defendant argues that the jury lost its way in reaching a guilty verdict, and therefore the guilty verdict was a manifest miscarriage of justice. We disagree with defendant.
 {¶ 17} The jury's resolution of conflicting testimony was reasonable given the evidence presented at trial. Defendant testified that Mr. Bradley punched him in the face, defendant fell, and due to his fear of being assaulted, ran from the scene. According to defendant, he heard the gunshots as he was running from the scene. To the contrary, witnesses for the state testified that they saw defendant shoot Mr. Bradley. Defendant argues that the testimony of the civilian witnesses lacked credibility because the testimony was "uncertain," "unreliable," and "conflicting." (See defendant's brief, at 5.) We recognize that the testimony of Officers Davis and Weir indicates that, at least initially, witnesses to the shooting were unwilling to fully cooperate with any investigation. However, we also observe that witnesses of the shooting may have initially believed that the situation was unsafe and unstable immediately after the shooting, despite the police officers' attempt to secure the area, and therefore were initially hesitant to identify a gunman in the shooting death of Mr. Bradley. Although there was reason to doubt the credibility of Mr. Mitchell, his testimony was not so unbelievable that no reasonable person could believe the testimony, especially considering that his testimony is corroborated with the testimony of other witnesses. Despite the inconsistencies in the testimony of the witnesses for the state, with respect to their own previous statements as well as the testimony of others, we find that the jury reasonably resolved conflicts in the evidence when it concluded that defendant murdered Mr. Bradley. Moreover, the pretrial identification procedure utilized by the police was not unnecessarily suggestive under the totality of the circumstances, and thus did not render the pretrial and subsequent in-court identifications as unreliable as a matter of law.
 {¶ 18} After carefully reviewing the evidence, we do not find that the jury "lost its way" when it determined that defendant murdered Mr. Bradley, and we conclude that defendant's conviction was not against the manifest weight of the evidence. Accordingly, we overrule defendant's first assignment of error.
 {¶ 19} In his second assignment of error, defendant asserts that he was denied effective assistance of trial counsel. In order to establish ineffective assistance of counsel, defendant must meet the two-part test outlined in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, defendant must demonstrate that his trial counsel's performance was deficient. Namely, defendant must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. We observe that a strong presumption exists that trial counsel's conduct or omissions are within the wide range of reasonable professional assistance. Id. at 689. In other words, "[t]here is a strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy." State v. Nichols (1996), 116 Ohio App.3d 759,764. Therefore, a court reviewing an ineffective assistance of counsel claim must determine whether, under the circumstances, the acts or omissions were "outside the wide range of professionally competent assistance." Strickland, at 690.
 {¶ 20} Second, in order for defendant to establish ineffective assistance of trial counsel, defendant must demonstrate that the deficient performance prejudiced defendant. This requires defendant to show "that counsel's error were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 {¶ 21} On December 19, 2001, counsel for defendant filed a motion to suppress identification, arguing that "any identification evidence of the Defendant by all the prosecuting witnesses be suppressed" because "[t]he evidence should show such pre-trial identification was secured by means that were unnecessarily suggestive and conducive to irreparable mistake in identification." However, at trial, defendant's counsel withdrew said motion. Defendant argues on appeal that his trial counsel committed error by withdrawing the motion to suppress the identification evidence. More specifically, defendant argues that "counsel was deficient and the defendant was prejudiced because of the failure to challenge what is apparently inadmissible identification testimony prior to trial." (Defendant's brief, at 9.) We find defendant's argument with respect to the decision of defendant's trial counsel to withdraw the motion to suppress identification to be without merit.
 {¶ 22} Defendant has failed to demonstrate that trial counsel's performance was objectively deficient. Defendant's original counsel filed a motion to suppress identification prior to trial, and defendant's subsequent trial counsel took affirmative action and withdrew said motion at trial. When defendant's trial counsel withdrew the motion to suppress, he did not provide a reason for the withdrawal. (See Tr. 6.) Considering it would have been proper for the trial court to deny said motion, as discussed infra, we conclude that the decision to withdraw the motion to suppress was a tactical decision within the realm of reasonable professional judgment.
 {¶ 23} Trial counsel's withdrawal of the motion to suppress did not prejudice defendant because the motion would have been denied. We note that the "[f]ailure to file a motion to suppress constitutes ineffective assistance of counsel only if, based on the record, the motion would have been granted." State v.Randall, Franklin App. No. 03AP-352, 2003-Ohio-6111, at ¶ 15, citing State v. Robinson (1996), 108 Ohio App.3d 428. In order for defendant to have prevailed with a motion to suppress identification evidence, defendant would have been required to show that the procedure used by the police to gather evidence in this case, namely the use of the single photograph at the scene of the crime, was "unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno (1967),388 U.S. 293, 302, 87 S.Ct. 1967. When determining "whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive * * * the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers (1972), 409 U.S. 188,199, 93 S.Ct. 375.
 {¶ 24} In this case, the identifications by the witnesses at the scene of the crime occurred a short time after the shooting, and the witnesses' degree of attention was likely elevated at the time of the shooting. Furthermore, Ms. Medley testified that she was familiar with defendant prior to the shooting. Upon our consideration of the circumstances of this case, including the above facts, we can only conclude that if the motion had not been withdrawn, it would have been proper for the trial court to deny the motion to suppress identification evidence. Therefore, trial counsel's decision not to pursue the motion to suppress identification resulted in no prejudice to defendant.
 {¶ 25} For the foregoing reasons, we conclude that defendant was not denied effective assistance of counsel. Consequently, we overrule defendant's second assignment of error.
 {¶ 26} Having overruled defendant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and Watson, JJ., concur.
[1] Under R.C. 2903.02(A), "[n]o person shall purposely cause the death of another[.]" R.C. 2903.02(D) provides that "[w]hoever violates this section is guilty of murder[.]"
[2] Patrick Fardal, M.D., a stipulated expert in the area of pathology, performed an autopsy of the victim, Mr. Bradley. Dr. Fardal testified at trial that Mr. Bradley died "solely, exclusively from a gunshot wound to his chest with injuries through his heart and his vena cava, his right lung. Basically he bled to death internally." (Tr. 216.)